**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**MEGAN CHRISTINE GIBSON,**

      **Plaintiff,**

**vs.**                                    **CIVIL ACTION NO. 3:17-CV-00921**

**NANCY A. BERRYHILL,[1]
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATION**

      This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. By Order entered January 26, 2017 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the Plaintiff's Memorandum in Support of Judgment on the Pleadings, and the Defendant's Brief In Support of Defendant's Decision. (Document Nos. 17 and 18.)

      Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **GRANT** Plaintiff's request for judgment on the pleadings (Document No. 17.), **DENY** Defendant's request to affirm the

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

decision of the Commissioner (Document No. 18.); **REVERSE** the final decision of the Commissioner and **REMAND** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g); and **DISMISS** this action from the docket of the Court.

**Procedural History**

The Plaintiff, Megan Christine Gibson (hereinafter referred to as "Claimant"), protectively filed her application for Title XVI benefits on December 11, 2013, alleging disability since October 10, 2013 due to "anger disorder, bipolar disorder, major depressive disorder, obsessive-compulsive disorder, panic attacks, avoidance personality traits, thyroid disease, MTHFR factor 5, stroke with residual effects, heart problems, cervical dysplasia, high cholesterol, and pre-diabetes".[2] (Tr. at 200.) Her claim was initially denied on March 31, 2014 (Tr. at 115-119.) and again upon reconsideration on August 12, 2014. (Tr. at 125-131.) Thereafter, Claimant filed a written request for hearing on September 5, 2014. (Tr. at 135-137.) An administrative hearing was held on June 4, 2015 before the Honorable C. Howard Prinsloo, Administrative Law Judge ("ALJ"). (Tr. at 31-65.) On June 26, 2015, the ALJ entered a decision finding Claimant had not been under a disability at any time from the date of her application through the date of the decision. (Tr. at 13-30.) On August 20, 2015, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 8-12, 264-270.) The ALJ's decision became the final decision of the Commissioner on November 28, 2016 when the Appeals Council denied Claimant's Request for

---

[2] In her Disability Report – Appeal, submitted on May 15, 2014, Claimant alleged that since her last Disability Report dated January 9, 2014, she "[has] been in a few altercations since last updated. Stopped in middle of road and went back to car that was tailgating [me] and nearly got in a fight with the driver. He threatened to call the cops on [me] and told [me] that [I] was crazy. [I] also got in a fight with [my] aunt at a family party when [I] objected to [my] aunt trying to control [my] daughter." She alleged that she cannot control her actions when she becomes angry and her psychiatrist told her that this was a compulsive disorder; the medications have lost their efficacy. Physically, Claimant asserted that due to her high blood pressure, her legs swell and that she was to have an "echo done" on her heart in June 2014. (Tr. at 224-225.)

Review. (Tr. at 1-7.)

On January 25, 2017, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.) The Commissioner filed an Answer, Amended Answer, and a Transcript of the Administrative Proceedings. (Document Nos. 10, 11, 12.) Subsequently, Claimant filed a Memorandum in Support of Judgment on the Pleadings (Document No. 17.), in response, the Commissioner filed a Brief in Support of Defendant's Decision (Document No. 18.), to which Claimant filed a reply. (Document No. 19.) Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was 31 years old on the date she filed for disability, and is considered a "younger person" by the Regulations throughout the underlying proceedings. See 20 C.F.R. § 404.1563(c). (Tr. at 24.) Claimant has at least a high school education (Tr. at 201.) and last worked as a home health aide, where she "just sat with a lady in her home". (Tr. at 36.) Claimant's disability was primarily due to her mental impairments. (Tr. at 34.)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 416.920(a). The first inquiry under the sequence is whether a claimant

is currently engaged in substantial gainful employment. Id. § 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. § 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 416.920a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture

of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 416.920a(d)(1).[3] Fourth, if the claimant's impairment(s) is/are deemed severe, the

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years'

SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 416.920a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 416.920a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since December 11, 2013, the application date. (Tr. at 18, Finding No. 1.) Under the second inquiry, the ALJ found that Claimant had the following severe impairment: borderline personality disorder. (Id., Finding No. 2.) At the third inquiry, the ALJ concluded that the severity of Claimant's impairment did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 19, Finding No. 3.) The ALJ then found that Claimant had the residual functional capacity ("RFC") "to perform a full range of work at all exertional levels but with the following nonexertional limitations: limited to

---

inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

6

brief and superficial interactions with the public or coworkers." (Tr. at 20, Finding No. 4.) At step four, the ALJ found that Claimant was incapable of performing her past relevant work. (Tr. at 23, Finding No. 5.) At the final step, the ALJ found that in addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience, and RFC indicated that there were jobs that exist in significant numbers in the national economy that Claimant could perform. (Tr. at 24, Finding Nos. 6-9.) Finally, the ALJ determined Claimant had not been under a disability since December 11, 2013 through the date of the decision. (Tr. at 25, Finding No. 10.)

**Claimant's Challenges to the Commissioner's Decision**

Claimant asserts that the ALJ improperly discounted the opinion of her treating physician, Amy Garmestani, M.D., when he deemed it "vague" relevant to Claimant's chronic dependent edema; Claimant also contends that the ALJ failed to consider Dr. Garmestani's treatment notes despite giving her opinion "little weight", and did not discuss what other persuasive contradictory evidence to support his determination. (Document No. 17 at 9-12.) Claimant argues further that the Regulations provide that the Commissioner resolve any insufficiency of the evidence, however, despite the ALJ's finding such an insufficiency, there is no evidence that he attempted to resolve it. (Id. at 12-13.) In addition, Claimant states that the evidence from Valley Health Systems submitted to the Appeals Council and made a part of the record, fills the evidentiary gap identified by the ALJ, specifically with regard to Claimant's physical impairments, namely, edema and colitis. (Id. at 13-15.) Because this new evidence fills the evidentiary gap that influenced the ALJ's decision, remand is appropriate. (Id. at 15.) Claimant also contends that the ALJ's credibility analysis was deficient under the applicable Regulations and Social Security Ruling insofar as he only provided conclusory statements without discussing the evidence that lead to his conclusion

finding Claimant less than credible. (Id. at 16-18.) Finally, Claimant asks this Court to find that she is disabled and enter an order reversing and remanding for an award of benefits, or alternatively, remand this matter for further proceedings to correct the errors made below. (Id. at 19.)

In response, the Commissioner argues that the ALJ properly discounted Dr. Garmestani's opinion because she did not explain for how long Claimant should elevate her legs or how it would interfere with a workday. (Document No. 18 at 11-12.) Further, the ALJ noted that Claimant's treatment for edema was intermittent and controlled with treatment. (Id. at 13.) The ALJ was not obligated to contact Dr. Garmestani in order to clarify her opinion regarding Claimant's edema, and the ALJ had enough evidence in order to determine that Claimant's edema was not a severe impairment. (Id. at 13-14.) The Commissioner argues that the ALJ also does not have to address every piece of evidence in a decision, to ask this Court to do so is akin to asking it to reweigh the evidence. (Id. at 14-15.)

With respect to the credibility analysis, the ALJ provided more than conclusory statements finding Claimant less than credible: the objective medical evidence of record did not comport with her complaints; she had relatively conservative treatment; she received no counseling; she had a problematic relationship with Xanax despite her history of opioid addiction; she exhibited multiple instances of failing to comply with treatment; and she had a poor work history. (Id. at 15-18.) In short, the ALJ's credibility assessment was sound. (Id. at 18.)

Moreover, the Commissioner asserts that the Appeals Council was under no obligation to review the additional evidence Claimant submitted after the ALJ issued his decision. (Id.) The Commissioner adds that the additional evidence does not fill an evidentiary gap with respect to

Claimant's physical complaints, and only indicated that she complained of leg swelling on two occasions, but otherwise had no localized swelling of the leg and no edema; this evidence is consistent with the ALJ's finding that Claimant's edema was intermittent. (Id. at 19.) Further, with regard to Claimant's complaints of a migraine, the new evidence indicates that she was only treated once, given medication, and instructed to follow up if her symptoms worsened. (Id.) There was no evidence that Claimant followed up. (Id.) The same holds for Claimant's complaints of colitis, the new evidence did not indicate she had been treated more than twice, her diagnostic testings were normal, and her symptoms had improved significantly. (Id. at 20.) In short, the new evidence Claimant submitted after the ALJ issued his decision would not have changed the outcome of her case, therefore, the Appeals Council rightfully denied her request for review. (Id.)

The Commissioner states that the ALJ's decision is supported by substantial evidence and asks the Court to affirm it. (Id.)

In reply, Claimant reasserts though the Regulations do not require and adjudicator to contact a medical source to resolve an insufficiency or inconsistency in the source's medical records, the intent of 20 C.F.R. § 416.920b provides that an ALJ is still expected to resolve any inconsistencies or insufficiencies in the records by recontact with a medical source as the most effective and efficient method to resolve those issues. (Document No. 19 at 1-2.) Claimant again contends that the ALJ made no effort to resolve the identified insufficiencies and further, failed to discuss all the relevant evidence, specifically Dr. Garmestani's treatment notes, when the ALJ determined the weight of her opinion. (Id. at 2-3.) Claimant renews her request to reverse and remand the decision for the ALJ to correct these errors. (Id. at 4.)

9

**The Relevant Evidence of Record**[4]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Treatment for Physical Impairments:

Edema:

On October 28, 2013, Claimant presented to St. Mary's Medical Center with complaints of lower extremity edema for four weeks.[5] (Tr. at 538.) On examination, Claimant was warm to the touch and displayed 1+ pedal edema. (Tr. at 541.) Despite her leg edema, she had normal range of motion and no calf tenderness. (Tr. at 550.) An ultrasound showed no evidence of deep vein thrombosis. (Tr. at 555.) Claimant was discharged the next day, and instructed to remain on a low fat, low cholesterol, low sodium diet. (Tr. at 566.)

Treating Physician Records:

In November 2013, Claimant established care with primary care physician Amy Garmestani, M.D. following her October hospitalization for edema. (Tr. at 365.) At that time, Claimant had no localized leg swelling. (Tr. at 367.) At her follow up appointment in December, she reported "doing well". (Tr. at 361.) Her pretibial edema had resolved, and there was no localized leg swelling. (Tr. at 361, 363.)

On January 27, 2014, Dr. Garmestani noted that Claimant had a history of a thromboembolic disease, Methylenetetrahydrofolate Reductase Deficiency (MTHFR), and

---

[4] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.
[5] Claimant also had complaints of intermittent chest pain for two weeks and shortness of breath (Tr. at 548.); due to her history of MTHFR, a left heart catheterization, selective coronary angiography, and left ventriculography that indicated she had no significant angiographic evidence of epicardial coronary artery disease. (Tr. at 557-558.)

previously had a stroke due to a patent foramen ovale. (Tr. at 354.) She reported that her legs had been swelling for about four months, and she had experienced tingling and pain in her feet. (Id.) Dr. Garmestani ordered a venous doppler ultrasound, which was performed on January 29, 2014; it showed no evidence for deep venous thrombosis. (Tr. at 357, 369.)

On March 24, 2014, Claimant again presented with complaints of persistent lower extremity edema that was worse at night. (Tr. at 395.) Dr. Garmestani noted localized swelling of Claimant's legs and dependent edema bilaterally. (Tr. at 397.) She ordered a comprehensive metabolic panel and prescribed hydrochlorothiazide. (Tr. at 398.)

In May 2014, Claimant reported an increase in lower extremity swelling even while compliant with hydrochlorothiazide. (Tr. at 391.) Additionally, Claimant was reporting severe migraines three to four times a week. (Id.) Dr. Garmestani observed Claimant to have localized swelling of the leg with +1 edema bilaterally. (Tr. at 393.) She ordered an echocardiogram and blood work and increased the dosage of hydrochlorothiazide. (Tr. at 394.)

On June 5, 2014, Dr. Garmestani noted Claimant's leg swelling had improved since the increase in her medication; however, Claimant reported her feet continued to tingle all the time. (Tr. at 387.) On physical examination, Dr. Garmestani continued to observe localized swelling of the leg albeit improved from the prior examination. (Tr. at 389.) The echocardiogram demonstrated a normal left ventricular systolic function and ejection fraction of 57 percent. (Tr. at 399.) However, this study also showed borderline to mild concentric left ventricular hypertrophy with a mild Grade 1 left ventricular diastolic dysfunction, mild tricuspid insufficiency, and mild mitral insufficiency. (Id.) Dr. Garmestani submitted a prescription pad noting: "Megan has chronic dependent edema for which she is prescribed medication. Recommendations for treatment at time

11

include low sodium diet & elevation of the lower extremities." (Tr. at 239, 740.)

By August 7, 2014, Claimant reported overall she had been feeling better, although the tingling and numbness she was experiencing in her feet was affecting her hands as well, which was worse at night. (Tr. at 429.) Although her migraines had subsided for a time, she recently had developed a migraine that lasted several days. (Id.) Dr. Garmestani found no localized swelling of the leg, diagnosed Claimant with carpal tunnel syndrome, and prescribed her wrist splints to wear at night. (Tr. at 431.)

On October 23, 2014, Claimant again reported generalized fatigue and a severe headache that would not go away. (Tr. at 418.) Again, Dr. Garmestani observed no localized swelling of the leg. (Tr. at 420.) At the follow up appointment on November 13, 2014, Claimant complained of fatigue that was worse in the last two weeks. (Tr. at 410.) Dr. Garmestani again observed no localized swelling of the leg. (Tr. at 412.)

State Agency Medical Consultant:

On June 30, 2014, Pedro F. Lo, M.D. reviewed the record and opined that Claimant could perform medium work, with occasional postural limitations. (Tr. at 109.)

Treatment for Mental Impairments:

Midland Behavioral Health:

Records indicate that Claimant had been treated for mental health issues at Midland Behavioral Health since January 2013. (Tr. at 294-339.) She treated with nurse practitioner Vickie Thomas and therapist Kelly Daniel. (Id.) Mental status examinations between January 2013 and August 2013 revealed a normal, neat, and casual appearance, full orientation, generally normal speech, fair to normal insight and judgment, fair to good eye contact, no hallucinations or

delusions, thought process ranging from racing to normal, and mood ranging from anxious to euthymic. (Tr. at 294, 296, 298, 300, 304, 307, 310, 330, 334, 336, 338.) She was diagnosed with mood disorder, panic disorder with agoraphobia, generalized anxiety disorder, bipolar disorder, obsessive-compulsive disorder, and moderate recurrent major depression. (Id.)

On July 8, 2013, Claimant underwent a psychological evaluation with Matthew C. Kellar, Psy.D., and Donna M. Midkiss, Psy.D. (Tr. at 315-327.)  The results revealed that Claimant had little difficulty sustaining attention over time and under varying tasks requirements. (Tr. at 325.) Personality testing revealed borderline personality traits and historical evidence of discord in interpersonal relationships. (Id.) She was diagnosed with major depressive disorder (recurrent, moderate), obsessive-compulsive disorder, panic disorder, borderline and avoidant personality traits, and a Global Assessment of Functioning score of 65.[6] (Tr. at 326.)

When compliant with medication management, Claimant reported partial benefits: she was able to leave the house; reported some improvement in sleep, depression, and mood; had less frequent panic attacks; and worried less. (Tr. at 294-296, 304, 309-310.) On July 17, 2013, Claimant reported that she had not been compliant with treatment recommendations, and complained of interrupted and poor sleep, increased depression, irritable and agitated mood, low energy, racing thoughts, and poor motivation.  (Tr. at 330.) By August 8, 2013, Claimant reported her mood was better and her sleep was normal, as a benefit from compliance with her medication

---

[6] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 61-70 indicates that the person has "some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

and treatment recommendations. (Tr. at 334.)

On January 27, 2014, Claimant reported being compliant with medication, however, her mood was very depressed, she had low energy, poor motivation and mood swings, as well as poor sleep. (Tr. at 336.) By February 10, 2014, Claimant continued to be compliant with her medication, but reported anxiety, depressed, low energy, picking at her skin, counting and repetitive behaviors. (Tr. at 338.) It was noted that Claimant tolerated her medicine, but had not "seen a lot of benefit with the latuda yet, but has only been taking it for about 10 days." (Id.) On April 28, 2014, Claimant continued to be compliant with her treatment recommendations, but she complained of anger, mood swings, moderate depression, low energy and poor motivation. (Tr. at 380.) She reported that she stopped in the middle of the street to "tell off" a man who was following her too close. (Id.) On mental status examination at each of the last three visits, Claimant was neat and casual, oriented, had normal rate and volume of speech, normal insight and judgment, normal psychomotor behavior and good eye contact, normal, logical and goal directed thought process, no hallucinations or delusions, and congruent affect. (Tr. at 336, 338, 380.)

Treating Psychiatrist Records:

Claimant established care with psychiatrist Michael Hackman, M.D., for mental health on June 18, 2014. (Tr. at 440.) At her initial evaluation, she indicated that she was not working and seeking disability. (Tr. at 442.) The record before the ALJ indicated that Claimant continued to see Dr. Hackman at regular intervals from July 2014 through January 2015; she continued to complain of depression, worrying, impulsivity, and mood swings. (Tr. 415, 422, 433, 440, 736.) Mental status examinations consistently revealed that Claimant was well appearing, alert, had no disorientation, no impairment of abstract reasoning, normal speech, no decreased eye contact,

intact insight, non-impaired thought process and content, but dysthymic, labile, depressed, and irritable mood. (Tr. at 415, 423, 434-35, 437, 443, 737.) At follow up visits in August and September 2014, she reported being off her medication because they made her too sleepy or sick (Tr. at 422, 433.), resulting in agitation and increased depression. (Id.) However, when taking Cymbalta regularly, she reported less irritability. (Tr. at 425.) Once Claimant claimed she missed an appointment because she was sick of medication before later admitting that she had forgotten to go. (Tr. at 433.) In November 2014, Claimant reported that she found some suggestions for treatment helpful, but that she did not plan to follow others. (Tr. at 415.)

Department of Health and Human Resources:

On March 31, 2014, Nurse Thomas opined that Claimant would be incapacitated for about three months, with difficulty completing tasks as well as difficulty with crowds and interacting with others due to her increased symptomatology. (Tr. at 739.) She did not believe Claimant could participate in work activity at least five hours per week, although she could care for a child under the age of 6, and did not require someone else to stay home with her on a continuous basis. (Id.)

Consultative Psychological Examiner:

On August 5, 2014, Claimant underwent a psychological consultative examination with Rachel Arthur, M.A. (Tr. at 403-408.) Claimant reported that she was not currently receiving counseling or therapy, saying that therapy was not beneficial, and that talking does not work. (Tr. at 405.) She had no history of psychiatric hospitalizations. (Id.) Claimant reported that she last worked as a home health aide in October 2013, but got "pissed off and quit". (Tr. at 403.)

Claimant reported a history of anger control problems and poor interactions with others, does not like authority figures, has to do things at her own pace at her own time, and the reason

why she could not maintain employment. (Tr. at 404.) She explained that she is not social and "eats Xanax all day"; since her strokes, she felt like she "was reborn again into a completely different person . . . like a full rage on bitch." (Tr. at 404, 408.) Claimant reported that she spends a typical day cleaning, caring for children, running errands, cooking, watching television, and performing personal care without prompts except when very depressed. (Tr. at 407.) She drives, shops for herself and family, and handles finances independently, although she reported not having a checking account because she is "not good with counting money" and cannot "deal with it." (Id.)

On examination, Claimant was casually dressed, had good grooming and hygiene; had good eye contact; had adequate verbal responses, and average and loud speech; was cooperative; interacted appropriately with the examiner; was logical and coherent; was fully oriented to time, space, self, others and situation; had no impairment in thought process; had average rate of thoughts and appropriate content; had adequate insight, mildly deficient judgment and recent memory; normal immediate and remote memory; and an apprehensive mood with full range affect. (Tr. at 406.) Her concentration appeared normal based on her scaled score on the digit span test, with normal psychomotor activity. (Id.) Her pace was average, and persistence and interaction with the examiner were within normal limits, though her prognosis was poor. (Tr. at 407-408.)

State Agency Psychological Consultant:

On March 29, 2014, Jeff Harlow, Ph.D. reviewed the record and opined that Claimant could perform repetitive one and two-step work activities. (Tr. at 96.) On August 8, 2014, Debra Lilly, Ph.D. opined that Claimant could learn, recall, and perform routine, repetitive tasks in settings without frequent interpersonal interactions or production quotas. (Tr. at 111.)

Evidence Submitted to Appeals Council:

Evidence from Valley Health Systems was submitted to and accepted by the Appeals Council as new and material evidence under 20 C.F.R. § 416.1470(b) and entered it into the record as Exhibits 18F and 19F. (Tr. at 752-866.) Of interest here is the evidence pertaining to Dr. Garmestani's treatment notes related to Claimant's colitis, migraines, and edema from February 2015 through May 2015. (Tr. at 752-805, 806-854.)[7] At follow up appointments on April 9, 2015 and May 7, 2015, Claimant reported an increase in lower extremity swelling to Dr. Garmestani, however, her blood pressure was well-controlled. (Tr. at 782, 784, 787, 789.) All visits with Dr. Garmestani during this period document no localized leg swelling or edema. (Tr. at 778, 803, 826, 833, 853, 856.) Claimant also treated with Dr. Garmestani on two occasions for follow up for her gastrointestinal pain and watery diarrhea. (Tr. at 782, 787.) She complained of occasional cramping, but overall her symptoms "significantly improved". (Tr. at 787.) A CT of the abdomen and pelvis demonstrated a tear of the colonic mucosa, but a follow up colonoscopy was normal. (Id.) An abdominal ultrasound showed a normal sonographic examination, no cholelithiasis or evidence of acute cholecystitis, and a normal common bile duct. (Tr. at 805.) Claimant was referred to gastroenterology, but there is no record of a follow-up. (Tr. at 790.)

At a walk in encounter on June 29, 2015, Claimant treated with Amy Marstellar, M.D. for a migraine. (Tr. at 816.) She was provided with medication, and told to follow up if her symptoms worsened. (Tr. at 818-819.) There is no evidence that Claimant followed up.

The medical records also indicate that Claimant had follow up appointments with Dr. Hackman in February, March, June and July 2015. (Tr. at 792-794, 797-800, 812-815, 820-823.)

---

[7] The records indicate that Claimant continued to see Dr. Garmestani through December 2015, primarily for "sick visits", and then on June 20, 2016, she established treatment with Bethany Anderson, APRN, FNP-BC. (Tr. at 855-859.)

A mental status exam on February 9, 2015 noted that Claimant had "kinda been getting out and about," with less depression, and that she was doing more things and sleeping well at night, despite having problems with irritability. (Tr. at 797-798.) She reported feeling "ok, about the same as last time" at her follow up appointment in March. (Tr. at 792.) By June, however, Claimant returned and reported, "I'm driving myself crazy and I'm falling apart." (Tr. at 813.) She reported feeling more depressed the last two months, and more hyper/irritable/tearful and not sleeping well. (Id.) Her medications were increased. (Tr. at 815.) At her follow up appointment in July, Claimant reported feeling very sleepy, she was also sick with recurring sinusitis. (Tr. at 821.) Her medications were unchanged and refilled. (Tr. at 822.) At each of the four visits in the record, Claimant demonstrated no disorientation or impairment of abstract reasoning, normal speech, no decreased eye contact, intact insight, no impairment of thought processes. (Tr. at 793-794, 798, 814, 821.) Claimant was later discharged by Dr. Hackman due to missed appointments. (Tr. at 850.)

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that she was not a certified nursing assistant and only sat with an elderly woman in her home, part-time, for about six months in 2013. (Tr. at 35-36.) She stated the heaviest she lifted was a potty chair. (Tr. at 36.) She stated she previously performed residential cleaning and assisted a disabled woman with errands and preparing meals. (Tr. at 37.)

Claimant admitted she had experienced symptoms of depression and obsessive compulsive disorder since childhood, which she believed were triggered because she was sexually molested by her father. (Tr. at 37-38.) She stated she had been in and out of therapy since she was 13 (Tr. at

53.), but her mental conditions worsened since she had a stroke. (Tr. at 38.) She described mood swings that included anger, yelling, screaming, cursing, and ripping shower doors off the wall. (Id.) She stated her mother threatened to take her children away because of this. (Id.) She also described episodes of severe depression lasting for "weeks" and included in her staying in bed and not showering, brushing her teeth, washing her hair, getting dressed, or eating. (Id.) She stated, in her last job, she had missed at least 15 of 30 days because she mentally could not stick to a schedule and was fired. (Tr. at 50-51.)

Claimant also described manic episodes during which she would not sleep for three or four days and would clean compulsively. (Tr. at 47-48.) She stated that if she was interrupted from cleaning, she would get angry and cannot control herself. (Tr. at 48.) She admitted she had shoplifted and written bad checks while she was manic because she got "a thrill" out of wondering if she would get caught. (Tr. at 49.)

Claimant testified she was not married and had three children, ages 13, 11, and 10, who lived with her. (Tr. at 38-39.) She completed high school and dropped out of junior college. (Tr. at 52.) She stated her license was suspended but she still drove occasionally. (Tr. at 53.)

Claimant explained that she had been diagnosed with bipolar disorder and borderline personality disorder. (Tr. at 39-40.) She stated Vicky Thomas of Midland Behavioral Health had told her that she suffered from severe anxiety and anger issues and should not be around people. (Tr. at 40.) Claimant stated that in the past month, she had left her house only three times. (Tr. at 41.) One of those times was to chaperone her daughter's field trip to the zoo, which Claimant stated was "a horrible trip" because her body hurt and her feet swelled. (Id.) She stated it took her "a tremendous effort" to walk, and she was "a nervous wreck" the entire time. (Tr. at 41-42.)

Claimant testified she had been diagnosed with pitting edema in her lower extremities and that kidney disease had been ruled out as a cause. (Tr. at 42.) She stated that elevating her legs did sometimes help and that she usually elevated them over her heart approximately twice a day for 30 minutes at a time and each night. (Tr. at 42-43.)

Claimant stated she had tried various medications for her mental conditions but has not been able to find one that helps her. (Tr. at 44.) She stated she did not get along with family and friends and indicated she had been in a physical altercation with her mother and her stepmother. (Tr. at 44-45.) Claimant also described a confrontation with her child's teacher who she threatened to assault. (Tr. at 45.) She stated she had been fired from a job for being "mouthy." (Tr. at 50.)

She testified that she had diarrhea constantly, which she initially thought was a stomach virus or food poisoning. (Tr. at 46.) She stated she had been vomiting green bubbles and was bleeding from her rectum. (Id.) Claimant stated an MRI showed a rip or tear in her colon, and after an endoscopy and colonoscopy, she was referred to a gastroenterologist. (Tr. at 46-47.)

On an average day, Claimant stated her children could dress themselves, fix cereal and ride the bus. (Tr. at 47.) She stated she will fix them breakfast and drive them to school when needed and then go back to bed. (Id.) On a bad day, she would sleep the entire day. (Id.) Claimant stated her children have missed school during her depressive episodes, and she was required to meet with the principal twice about the possible consequences of her children's truancy. (Tr. at 39.)

Claimant testified she had panic attacks. (Tr. at 51-52.) She stated that her mind raced constantly and that she worried about things that do not make sense to others. (Id.) During a panic attack, Claimant stated she could not breathe, would sweat and experience heart palpitations, and feel like she was about to pass out. (Tr. at 52.)

Claimant stated she had never been hospitalized for her mental impairments but had been prescribed various medications. (Tr. at 54.) She stated she had not taken Lithium because her mother said it was an "old drug". (Tr. at 54-55.) She stated she had taken Depakote for six or seven months, but it made her sick so she discontinued it. (Tr. at 55.) She also had attempted Wellbutrin and Prozac, but none of her medications helped her symptoms. (Tr. at 55-56.) Claimant confirmed she has continued to take Xanax three times a day for the past two or three years. (Tr. at 57.) She indicated she no longer had a problem with opiate addiction. (Tr. at 58.)

Claimant testified that since her stroke, she also suffered from migraines and dropped things with her left hand. (Id.) She stated her hands and feet go numb and that she had been diagnosed with carpal tunnel syndrome. (Id.) Claimant stated she had been prescribed Coumadin and Plavix and now took an aspirin a day. (Tr. at 59.) She stated she could not sit for longer than two hours due to the swelling in her legs. (Id.) Claimant explained she also suffered from MTHFR and was vitamin B and vitamin B12 deficient. (Tr. at 60.)

Ellen Christine Jenkins, Vocational Expert ("VE") Testimony:

The VE described Claimant's past work as a home health worker (DOT No. 355.677-014) at the semi-skilled, medium exertional level. (Tr. at 61.) In response to the ALJ's question, the VE testified that an individual with Claimant's vocational profile and controlling RFC could not perform this past work. (Tr. at 61-62.) The VE stated the individual could perform other work, such as production inspector at the sedentary exertional level, copier operator at the light exertional level, and cleaner at the medium exertional level. (Tr. at 63.) The VE confirmed that no work would be available if the individual also needed to elevate her legs to the height of a footstool at the work station. (Tr. at 64.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

Analysis

As previously stated, Claimant argues that the ALJ's decision is not supported by substantial evidence because: (1) the ALJ improperly gave little weight to the opinion of her treating physician; (2) new evidence submitted to the Appeals Council filled the evidentiary gap identified by the ALJ; and (3) the ALJ improperly discounted Claimant's credibility. (Document No. 17 at 7.)

Evaluating Opinion Evidence:

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. § 416.927(c)(2). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 416.927(c)(2). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. § 416.927(c)(2). Ultimately, it is the responsibility of the Commissioner, not the court, to review the case, make findings of fact, and to resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 416.927(c)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. § 416.927(c)(2).

In this particular case, the ALJ noted "a treating provider's note, from Amy Garmestani, M.D., in June 2014 that the claimant would need to elevate the lower extremities." (Tr. at 19.) The ALJ expressly gave this opinion "little weight",[8] finding it "vague and does not detail how long the claimant needs to elevate her legs, and the extent to which it would interfere with a work day." (Id.) The ALJ acknowledged that "the alleged period of disability is primarily related to mental health treatment, and not the treatment of physical impairments", though recognized that Claimant alleged in her application and during her testimony that her primary physical complaints concerned colitis and swelling. (Tr. at 18.) The ALJ determined that Claimant's physical complaints were under control with treatment, found that her colonoscopy was normal[9], and that her complaints of edema were "intermittent." (Tr. at 19.) The ALJ concluded that her physical impairments did not constitute severe medically determinable impairments. (Id.)

Beyond the aforementioned, there is nothing else in the decision relating to Dr. Garmestani. Pursuant to the applicable Regulations, *supra*, the ALJ acknowledged Dr. Garmestani as Claimant's treating physician, but discounted her opinion only because he found it "vague." Claimant's argument concerning the Commissioner's modification of the Regulations with respect to 20 C.F.R. § 416.920b(c)[10] is persuasive (Document No. 19 at 2.), particularly in light of the following explanation for the proposed rule changes:

---

[8] The ALJ also determined that the State agency medical consultant's opinion that Claimant was capable of medium work with occasional postural activities entitled to "little weight" because it "gives great deference to the claimant's initial allegations, but there is little in the medical record to support these allegations." (Tr. at 19.)

[9] The ALJ cited Exhibit 11F. (Tr. at 454-494.)

[10] If the evidence is consistent but we have insufficient evidence to determine whether you are disabled, or if after weighing the evidence we determine we cannot reach a conclusion about whether you are disabled, we will determine the best way to resolve the inconsistency or insufficiency. The action(s) we take will depend on the nature of the inconsistency or insufficiency by taking any one or more of the actions listed in paragraphs (c)(1) through (c)(4) of this section. We might not take all of the actions listed below. We will consider any additional evidence we receive together with the evidence we already have. (1) We may recontact your treating physician, psychologist, or other medical source. We may choose not to seek additional evidence or clarification from a medical source . . . . .

> Although we propose to eliminate the requirement that we recontact your medical source(s) first when we need to resolve an inconsistency or insufficiency in the evidence he or she provided, ***we expect that our adjudicators would continue to recontact your medical source(s) when we believe such recontact is the most effective and efficient way to resolve an inconsistency or insufficiency.*** For example, if we have a report from one of your medical sources that contains a functional assessment of your physical capacity for work, but no clinical or objective findings in support, we expect that the adjudicator would first contact that source to find out the reasons for his or her assessment. Similarly, when the medical evidence we receive from one of your medical sources contains an internal inconsistency about an issue relevant to our disability determination, we would also expect that our adjudicator would contact that source to resolve the inconsistency.

76 FR 20282-01, at *20283, 2011 WL 1359404 (emphasis added).

In short, given the factors the Regulations require an adjudicator to consider when a treating physician's opinion is afforded less than controlling weight, coupled with the aforementioned provision regarding the situation when an adjudicator is confronted with insufficient evidence, the undersigned **FINDS** that the ALJ's discounting Dr. Garmestani's opinion without further investigation or explanation was not a "good reason" envisioned by 20 C.F.R. § 416.927(c)(2), and is unsupported by substantial evidence.

<u>Evidence Submitted to Appeals Council:</u>

As described *supra*, Claimant submitted additional evidence after the ALJ issued his decision to the Appeals Council. Social Security Regulations allow two types of remand. Under the fourth sentence of 42 U.S.C. § 405(g), a court has the general power to affirm, modify or reverse the decision of the Commissioner, with or without remanding the cause for rehearing for further development of the evidence. 42 U.S.C. § 405(g); <u>Melkonyan v. Sullivan</u>, 501 U.S. 89, 97-98, 111 S.Ct. 2157, 2163, 115 L.Ed.2d 78 (1991). Where there is new medical evidence, a court may remand under the sixth sentence of 42 U.S.C. § 405(g) based upon a finding that the new evidence is material and that good cause exists for the failure to previously offer the evidence. 42

U.S.C. § 405(g); Melkonyan, 501 U.S. at 98, 111 S.Ct. at 2163. The Supreme Court has explicitly stated that these are the only kinds of remand permitted under the statute. Melkonyan, 501 U.S. at 98, 111 S.Ct. at 2163.

Pursuant to 28 U.S.C. § 405(g), remand is warranted "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding[.]" Evidence is "new" if it is not duplicative or cumulative. Wilkins v. Secretary, Dep't of Health & Human Serv., 953 F.2d 93, 96 (4th Cir. 1991) (*en banc*). "Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." Id. The Regulations governing the circumstances under which the Appeals Council is to review an ALJ decision shows that additional evidence will not be considered underline unless the evidence is new and material and relates to the period on or before the date of the ALJ decision. See 20 C.F.R. § 416.1470(b). This does not mean that the evidence had to have existed during that period; rather, evidence must be considered if it has any bearing upon whether the claimant was disabled during the relevant period of time. See Wooldridge v. Bowen, 816 F.2d 157, 160 (4th Cir. 1987); Cox v. Heckler, 770 F.2d 411, 413 (4th Cir. 1985); Leviner v. Richardson, 443 F.2d 1338, 1343 (4th Cir. 1971). "Pursuant to the regulations . . . , if additional evidence submitted by a claimant does not relate to the time period on or before the ALJ's decision, the evidence is returned to the claimant, and the claimant is advised about her rights to file a new application." Adkins v. Barnhart, 2003 WL 21105103, *5 (S.D.W. Va. May 5, 2003).

Claimant contends that the additional evidence from Valley Health Systems contains treatment notes concerning her physical impairments that the ALJ deemed non-severe, noting that there were few medical records of her physical complaints as her complaints were intermittent.

(Document No. 17 at 15.) Fourth Circuit jurisprudence does not support Claimant's contention that this additional evidence is "new" because it appears more duplicative or cumulative: Claimant complained of lower extremity swelling and gastrointestinal issues to her treating physician on two occasions during a treatment period from at least February through December 2015. Wilkins, 953 F.2d at 96. This has more support for the ALJ's finding these two physical complaints "intermittent." Further, the additional evidence does not appear to be "material" insofar as there is not a reasonable possibility that it would have changed the outcome of the ALJ's decision. Id. Despite Claimant's complaints of swelling, Dr. Garmestani noted no localized leg swelling. Despite Claimant's complaints of gastrointestinal pain and watery diarrhea, examinations were normal; further, there was no evidence Claimant followed up with a gastroenterologist. This additional evidence buttresses the ALJ's determination that those physical impairments appeared to be under control with treatment.

Moreover, with regard to the ALJ's treatment of Dr. Garmestani's opinion, and whether the evidence submitted to the Appeals Council filled the evidentiary gap by shedding light on the aforementioned physical impairments, the undersigned is hard-pressed to glean any further information from the treatment notes generated after the ALJ's written decision that illuminate the treating physician's "vague" opinion. Nevertheless, the ALJ had an obligation to provide further explanation for affording Claimant's treating physician's opinion less than controlling weight, the additional evidence submitted to the Appeals Council notwithstanding.

Evaluating Credibility and Pain:

Social Security Ruling 96-7p[11] clarifies the evaluation of symptoms, including pain: 20 C.F.R. § 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements. See, also, Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985).

The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

As an initial matter, it is well known that credibility determinations are properly within the province of the adjudicator and beyond the scope of judicial review. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Davis v. Colvin, 3:13-CV-23399, 2015 WL 5686896, at *7 (S.D.W. Va. Sept. 8, 2015) ("The credibility determinations of an administrative judge are virtually

---

[11] The undersigned is aware that this Ruling has been superseded by SSR 16-3p, effective March 28, 2016, however, the former Ruling applies to the ALJ's decision herein, having been issued on June 26, 2015. See, SSR 16-3p, 2016 WL 1131509.

unreviewable on appeal.") Claimant argues that the ALJ only made conclusory statements without citing the evidence of record he found discredited Claimant's subjective complaints. (Document No. 17 at 16.)

Contrary to Claimant's argument, the written decision demonstrates the opposite: Indeed, early on in his decision, the ALJ found Claimant had only mild restriction in activities of daily living, noting her statements in the Function Report that when she was experiencing symptoms of depression, she would not bathe, shave or get dressed, but "will still run errands, even though she would be dressed in pajamas." (Tr. at 19, 231-238.) Further, the ALJ noted the evidence demonstrated that she "rarely misses appointments", appeared well groomed and appropriately attired for same, and that Claimant admitted cooking and cleaning to the consultative examiner. (Tr. at 19, 403-408.)

The ALJ addressed Claimant's application for disability, noting she alleged several mental impairments, although her representative stated at the administrative hearing that "her symptoms fall under a single diagnosis (Exhibit 2E)." (Tr. at 21.) The ALJ acknowledged Claimant's alleged difficulties with her memory, completing tasks, interpersonal relationships, her social avoidance tendencies, and ability to pay attention for an hour at a time "(Exhibit 4E)." (Id.) Regarding Claimant's hearing testimony, the ALJ stated that she described her mood swings, "and how she spends weeks in bed without showering or eating." (Id.) Additionally, the ALJ acknowledged Claimant's testimony that her mood swings have even "resulted in her having physical altercations with multiple members of her family", impulsivity, as well as inability to maintain a schedule. (Id.)

The ALJ next properly performed the two-step process,[12] and then proceeded to review the evidence of record and reconciled it with Claimant's statements concerning the intensity, persistence and limiting effects of her symptoms. (Id.) This included Claimant's pre-alleged onset date appointments at Midland Behavioral Health, where records documented Claimant discontinued medications for side effects on her own and that she "demonstrated borderline personality traits (see generally Exhibit 2F at 27)." (Tr. at 21, 312.) The ALJ noted Claimant's last appointment prior to her alleged onset date the record indicated that she reported improvement with medication, "though it was adjusted as she still demonstrated fatigue (Exhibit 2F at 48)." (Tr. at 21, 333.) It was recognized that Claimant did not see another mental health provider until January 2014, and despite complaints of depression, low motivation and that "she stopped cleaning her house (Exhibit 2F, Exhibit 5F at 6.)", observations of her appearance, orientation, judgment, speech, insight, behavior, etc. were deemed normal. (Tr. at 21, 286-339, 376.) The ALJ made numerous references from the medical record documenting Claimant's mental health appointments, what she reported during those appointments, even the efficacy of the medications prescribed to her. (Tr. at 21, 433, 439.) The ALJ also addressed Claimant's consultative examination with Rachel Arthur, M.A., her complaints and the findings therein. (Tr. at 21-22, 403-408.)

The ALJ recognized that "[i]n examining the record, the mental health treatment notes do reflect ongoing symptoms in spite of treatment", though Claimant's treatment primarily consisted of monthly follow up appointments, and had "multiple incidents" of not complying with treatment recommendations. (Tr. at 22.) In short, the ALJ referenced the medical record at length regarding

---

[12] See, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

Claimant's mental impairments, including the opinion evidence concerning same, as described more thoroughly *supra*. (Tr. at 22-23.) At the end of his analysis, the ALJ decided

> [i]n sum, the above residual functional capacity is adequate to address the duration, frequency, and intensity of the claimant's symptoms, as well as any precipitating and aggravating factor. The claimant's subjective symptoms lack credibility to the extent that they purport to describe a condition of disability for Social Security purposes. Considering the claimant's treatment history, the objective clinical findings, the claimant's subjective complaints, and all of the medical opinions and evidence of record, the undersigned concludes that the claimant has the capacity to perform work at all exertional levels with the additional limitation set forth in the above residual functional capacity.

(Tr. at 23.) The ALJ's discussion of Claimant's subjective complaints, along with her own admissions of her daily activities, is illustrative that the ALJ reviewed the factors promulgated under 20 C.F.R. § 416.929(c) in addition to the objective medical evidence to assess Claimant's credibility, and is compliant with the Regulations.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Claimant's request for judgment on the pleadings (Document No. 17.), **DENY** the Defendant's request to affirm the decision below (Document No. 18.), and **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings in order for the ALJ to properly assess the opinion and treatment evidence from Dr. Amy Garmestani, Claimant's treating physician "to establish a longitudinal picture of [Claimant's] status" with respect to her physical impairments.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: August 2, 2017.

Omar J. Aboulhosn
United States Magistrate Judge